## Case No. 15,958.
### UNITED STATES v. ONE THOUSAND FIVE HUNDRED BALES OF COTTON.

[15 Int. Rev. Rec. 137; 4 Chi. Leg. News, 245; 1 Am. Law Rec. 93; 6 Am. Law Rev. 766.] [1]

Circuit Court, W. D. Tennessee. May, 1872. [2]

JUDICIAL NOTICE—MATTERS OF HISTORY—DATE OF MILITARY SURRENDER—CESSATION OF HOSTILITIES—SALE TO THE CONFEDERACY UNDER COMPULSION—LAWS OF CONFEDERACY—COERCION.

1. Courts will take judicial cognizance of the public history of the country, and in the modes of its ascertainment it is treated like a question of law, and investigated in the same manner in its own proper sources; thus public documents and histories are to be consulted.

2. Without deciding whether the court below should have taken judicial cognizance of the precise date when the surrender of the rebel general Kirby Smith occurred, or whether, when such accuracy becomes material, the proofs which the parties desire to present must be submitted to a jury, this is certainly clear that if the court assumes the duty of its determination it must decide it correctly; and it is as much an error for a court to mistake an historical fact of which it has taken cognizance as to mistake a principle of law. Thus the charge to the jury that the rebel general Kirby Smith surrendered on the 24th of May, 1865, was error. The common histories of the country, the Annual Encyclopedia, and repeated judgments of the courts show it to have taken place on the 26th of May, 1865.

3. It was conceded by the court below that if the cotton in question—which had been laden on the steamboat on the Red and other rivers in that portion of the state of Louisiana, then proclaimed to be in insurrection, and which was in the actual military occupation of the rebel military forces, commanded by General Kirby Smith—had started upon said steamboat, before the actual surrender of General Smith, for transportation to Memphis, Tenn., which was within the lines of federal military occupation, then the same would be forfeited under section 5, Act July 13, 1861 [12 Stat. 257], and amendatory acts prohibiting commercial intercourse between citizens of states in insurrection and citizens of the rest of the United States. Thus, upon the theory of the learned judge himself, said cotton was forfeited, because it had started on its transit before said surrender, it having left on May 25, and said surrender taking place on the 26th of May, 1865.

4. The legal consequence deduced from the erroneous assumption as to the time of the sur-

[1] [6 Am. Law Rev. 766, and 4 Chi. Leg. News, 245, contain only partial reports.]

[2] [Reversing Case No. 15,957.]

render of General Kirby Smith, that trade and intercourse became lawful between Louisiana and Tennessee and hostilities ceased upon the said surrender was no better grounded in the law than was the fact itself in the history of the country. The proclamation of the president, or other political recognition of the return of peace, was necessary to work such a consequence. The conditions of war and peace, the political status of governments and people in our system, are purely political, and not judicial determination. The entire legislative history and public action of the country in reference to the late Rebellion conclusively show that such has been the theory upon which our courts and the government have proceeded in its suppression, and dealing with its consequences. The supreme court of the United States in repeated and literally applicable judgments have so decided, and thus have set the matter wholly at rest.

5. It was error to suppose that the cessation of hostilities was synonymous with the surrender of organized armies, and that peace meant the disbanding of military forces, instead of a full return of the masses of the people to loyalty and good citizenship.

6. Where cotton had been sold to the Confederate government upon the understanding that it should sell and divide the proceeds, no forfeiture of such cotton will be incurred under section 1, Act Aug. 6, 1861 [12 Stat. 319], to confiscate property used for insurrectionary purposes, where it appears that the owners of the same were compelled by force or bodily fear to make such sales; but the mere existence of a law prescribed by an insurrectionary government in itself is insufficient to justify those who owe allegiance to a lawful sovereignty. And therefore the charge to the jury that a mere law without more was an excuse for obeying it was erroneous.

7. The Confederate government could make no law. Its prescriptions imposed no obligations, political or moral, and the only justification for obedience which the citizen could make to his rightful sovereign was deadly coercion by violence or threats.

[Error to the circuit court of the United States for the Western district of Tennessee.]

[The information in this cause charged— First, that the cotton had been sold or given with the intent of aiding in the insurrection; and second, that the cotton had been purchased in and was being transported from, a state in insurrection, to a loyal state, thus forfeiting the cotton to the United States, according to act of congress of July 13, 1861 (12 Stat. 255). Verdict was rendered in favor of claimants (Case No. 15,957), and this writ of error was brought.]

H. E. Hudson, U. S. Dist. Atty.

Haynes & Stockton, Henry Croft and Thomas R. Smith, for defendants in error.

EMMONS, Circuit Judge. This was a writ of error to reverse the judgment in the district court. The forfeiture was claimed upon two grounds. That the cotton had been voluntarily sold and delivered to the Confederate government in aid of the rebellion— and that it had been unlawfully removed from a district within the rebel lines to one within the lines of federal occupation. The writ of error brings up a written record of very voluminous character. We cannot but presume that it in some degree fails to represent the actual history of the trial. Nothing is more common than for a written record, by omissions overlooked by court and counsel when it is made up, to misrepresent most substantially the real judgment of the court. The decision here must necessarily be upon the bill of exceptions as it is, but our respect for the learned judge who tried this cause—our knowledge of his other judgments and rulings, so clearly evincive of opinions at war with some of those contained in this record—induce the belief that there must be a failure in some degree to reproduce the trial just as it occurred. The cause was argued many months since, and the court entertained no doubt whatever that manifest errors appeared. Upon inquiry of counsel, they were at the moment unable to find in the record the exceptions which were necessary to bring them here for consideration. The character of the charge and rulings were immaterial unless they were excepted to by the party aggrieved. The cause stood over for counsel to prepare their briefs, referring to the record for the facts material to the judgment, and especially to the exceptions—if any there were. The government's counsel aver they have long been ready, but from courtesy the counsel of the defendant in error, who were not so, the cause although several times referred to from the bench, was not again called to our attention until a few days since. A full, satisfactory and learned written argument is now before us for the plaintiff in error. The exceptions are ample to bring in review the faults complained of in the charge.

A single fault renders reversal as necessary as though there were many. As the cause will stand for a new trial in the circuit court, no opinion will be expressed upon questions not necessary for the decision, although they may be involved in a rehearing of the cause. There are, too, quite a number of points discussed and decided adversely to our opinions, which will, in all probability, not again arise in another trial.

A single question will be considered, and upon its answer alone the reversal of the judgment will rest. Did his honor the district judge correctly lay down the law in the following portion of his charge? It was made in disregard of a carefully drawn request to give contrary instructions. After remarking that the courts without any congressional resolution or law, or presidential proclamation, or other governmental action, must take judicial notice, without proofs, that civil war existed, he said:

"If the court will take judicial cognizance of the existence of the war, then they ought also to take cognizance of the fact of peace being restored. Will the court not take cognizance of the proof that Kirby Smith's surrender took place on the 24th of May, 1865? The war was then over. There were then no

organized bodies of men arrayed against the government. Prisoners were paroled and sent to their homes. Everybody knew this, and will it be said that this court will close its eyes to the fact and not know it until told so by the president?

"The jury having returned into court asked 'if the opinion of his honor as to the time when hostilities ceased, was binding upon the jury?' His honor replied that it was—that hostilities ceased on the 24th or 25th of May, 1865, and that fact he took judicial notice of. A juror then said, 'Your honor did not charge us in relation to the count in the information in regard to gold and foreign bills of exchange.' His honor stated that there was no proof to show that gold was used to pay for the cargo of the Decatur, and that he did not consider it necessary to charge in regard to that count, as the cessation of hostilities covered the case, and virtually repealed those laws."

We do not consider the erroneous assumption here that there was no proof of a fact which was largely contested before the jury. It is noticed only to say it is not impliedly sanctioned. This charge embodies several substantial errors. The court will take judicial cognizance of the public history of the country. It is treated, in its modes of ascertainment, like a question of law, to be investigated in the same manner, in its own proper sources. Public documents and histories are to be consulted without deciding whether the court should have taken judicial cognizance of the precise date when the surrender occurred, or whether, when such accuracy becomes material, the documentary, historical, and other proof which parties chose to present must not be submitted to a jury, it is of course clear that if the judge assumes the duty of its determination, he must decide it correctly. It is as much an error for the court to mistake an historical fact of which it has taken cognizance, as to mistake a principle of law. That his honor was in error when he told the jury that General Kirby Smith surrendered on the 24th of May, 1865, is now conceded. It is unnecessary to refer to the original documentary proof which demonstrates his mistake. The common histories of the country and repeated judgments in the books show it. The Annual Encyclopædia for 1865, p. 84, states it to be upon May 26. Phillips v. Hatch [Case No. 11,094] states it the same date. There is no difference of opinion anywhere. This was a turning point in the case below. The vessel left upon the 25th. It was conceded by his honor that if the surrender had not been until the 26th, so that within his own theories hostilities continued until that time, the cotton was forfeited to the government because it started on its transit before. The legal consequence which the learned judge deduced from this fact, thus erroneously assumed as taking place on the 24th, was no better grounded in the law than was the fact itself in the his-

tory of the country. Both were alike untrue. Trade and intercourse did not become lawful between Louisiana and Tennessee, and hostilities did not cease, upon the surrender of General Smith. The proclamation of the president, or other political recognition of the return of peace, was necessary to work such a consequence.

It has not been seriously argued that this part of the charge is law. The conditions of war and peace, the political status of governments and people, is in our system one purely of political and not judicial determination. If there were, as there is not, any doubt of this necessary rule of general law, the entire legislative history and public action of the country in reference to the late rebellion conclusively shows such has been the theory upon which our courts and the government have proceeded in its suppression and in dealing with its consequences. In reference to a subject where repeated and literally applicable judgments of the supreme court of the United States set the matter wholly at rest, it could not "be useful or even in good taste to go behind them for reasons to justify what they so plainly say." In U. S. v. Anderson, 9 Wall. [76 U. S.] 56, the statute limited prosecutions in the court of claims to two years after the suppression of the rebellion. It was held that the limitation did not begin to run, and that the rebellion was not in a legal sense suppressed until the final proclamation of the president, August 20, 1866. The argument of the court shows most clearly that we must rely upon the action of the political department as the criterion in this class of cases. At page 70 it is said, "In a domestic war, like the late one, some proclamation or legislation would seem to be required to inform those whose private rights were to be affected by it of the time when it terminated." We do not understand by this that as matter of law necessarily in all cases that legislation or proclamations are indispensable to terminate the legal condition of public political hostility. Nor do we in this judgment suggest even that such is the law. In reference to the point in judgment, it was natural for the court to say, especially where such definite action had in fact been had, that "it would seem to be required." Nothing more is meant, I apprehend, than that it was required by good government, in order to remove uncertainty in reference to private action. The government has thus far carefully pursued this manifest policy. It has from time to time declared the cessation of hostilities and the return of peace, and restored intercourse and trade, as state after state assumed the condition which, in the governmental judgment, rendered safe and politic such action. But if, on the contrary, without legislation or proclamations of any kind, it had suffered all these interests to assume their old channels, the courts would look to and accept this acquiescence as an implied recognition of a changed political status, as fully as though

it were testified in more direct modes and more fixed forms. The principle is alike in both cases. The courts would in all instances await the public action, in none anticipating the decision of the government. Before any such question can arise, time must elapse, public sufferance must be unquestioned, and such a condition exist as manifests an undoubted public consent to the new peaceful relations. No such situation existed here, and the ruling had no reference to such a principle. In Mrs. Alexander's Cotton, 2 Wall. [69 U. S.] 404, at page 419, in deciding that Mrs. Alexander's cotton was subject to seizure, because she resided in the enemy's country after taking the oath under the amnesty proclamation, Chief Justice Chase says that the belligerent relation having once been recognized by the political power, that "all the people of each state or district in insurrection must be regarded as enemies until by the action of the legislature and the executive, or otherwise, that relation is thoroughly and permanently changed." In Levy v. Stewart, 11 Wall. [78 U. S.] 244, deciding that the statutes of limitation were suspended during the Civil War, the court rely upon the legislation of congress and the proclamations of the president, as fixing the period when it commenced and closed. Stewart v. Kahn, 11 Wall. [78 U. S.] 493. The act of 1864, providing that a period during which a defendant could not be served with process should be deducted from statutes of limitations being under consideration, Justice Swayne, speaking of the duration of this condition in a legal sense and the effect of the several presidential proclamations, at page 506 says, "The decision of all such questions rests wholly in the discretion of those in whom the substantial powers involved are confided by the constitution." Speaking of the continuance of hostilities, and the power of suppressing them, at page 507, he adds: "In the latter case the power is not limited to victories in the field and the dispersion of insurgent forces. It carries with it inherently the right to guard against the renewal of the conflict, and to remedy the evils which have arisen from its rise and progress. This act (that of restraining the effect of the statutes of limitations) falls within the latter category." The whole judgment is a clear assertion of the federal political right to regulate the conditions of peace, and the duty of the courts to accept, when they are constitutional, the action of the government as entirely conclusive. U. S. v. One Hundred and Twenty-Nine Packages [Case No. 15,941]: In violation of the act of July 13, 1861, goods were laden on board a vessel in Missouri with the intention of transporting them to Memphis before the proclamation of the president declared the cessation of hostilities. Memphis at that time was in the occupation of the federal forces. It was held that the goods were forfeited for violation of the statute. Judge Treat announces that this is a political question and says, "The absurdity of any other rule is manifest. The state of the country as to peace or war is legally determined by the political and not the judiciary department. The same power which determines the existence of war or insurrection must also decide when hostilities shall cease." He cites the following cases as sustaining principles from which this doctrine is deduced: [Gelston v. Hoyt] 3 Wheat. [16 U. S.] 246; [U. S. v. Palmer] Id. 610; [The Divina Pastora] 4 Wheat. [17 U. S.] 52; [The Neustra Senora De La Caridad] Id. 497; [The Santissima Trinidad] 7 Wheat. [20 U. S.] 283; [Martin v. Mott] 12 Wheat. [25 U. S.] 19; [Rose v. Himely] 4 Cranch [8 U. S.] 241; [Foster v. Neilson] 2 Pet. [27 U. S.] 253; [Garcia v. Lee] 12 Pet. [37 U. S.] 511; [McElmoyle v. Cohen] 13 Pet. [38 U. S.] 315; [Luther v. Borden] 7 How. [48 U. S.] 1; [Kennett v. Chambers] 14 How. [55 U. S.] 46; [Christy v. Scott] Id. 283. All these judgments, save those in 12 Wheat. and 7 How., relate to the recognition by political power of foreign governments, or the belligerent status of revolted foreign provinces. It is not perceived that the doctrines they lay down are not directly applicable, as they have in fact been applied by the same court to cases of domestic violence. In 12 Wheat., it was said the statute devolved upon the president the political duty of determining when armed force should be called out to put down insurrection in the states. It was for him to decide when the exigency occurred. The courts had no concern with it. In 7 How., it was said, whether this rebel government of Dorr, or that under the old constitution of Rhode Island was in force, was one wholly for the government to decide. In an action of trespass, the courts, it was said, could hear no testimony whatsoever upon such a point. What the government recognized, the courts must conclusively deed the lawful power. Chief Justice Taney, in this case, fully illustrates the incompatibility of such a power in the courts with the conditions and consequences of the inquiry. If one jury should upon evidence decide that the government was supreme, another might decide differently. The court's judgments must be enforced by the political power, and its decision that it did not exist would be nugatory, and it was of necessity that it confined its decisions to the meaning and force of laws made by, and not the determination of the lawfulness of the government itself. Whether there was any necessity of the exercise of the power of the president to call out the militia, it said the court could not determine. His decision was final. The court could not call witnesses to prove which party represented a majority of the people. If the judicial power were thus extended, he said, the guaranty in the constitution of a republican form of government was a guaranty of anarchy, not of order. Equally incongruous results would follow if courts, instead of the government, were to de-

cide when hostilities are ended, and when trade and intercourse should be resumed. In a case under the same act (U. S. v. One Hundred Bbls. Cement [Case No. 15,945]), the same judge (Treat), after saying that a condition of hostilities is to be determined by the political department, adds, "that the status must remain in a legal sense until the same authority decides it to be at an end. Such is the true interpretation of the statute and proclamations." Phillips v. Hatch [Id. 11,094]: 1871 A note was made in Texas, after the surrender of Kirby Smith on the 26th of May, 1865, but before the proclamation of the president in August of that year, declaring that hostilities had ceased. In deciding that the note was void, because made between belligerents, Dillon, J., says: "From the nature of the question, from the fair implication of the act of July 13, 1861 (the one here in question), from the confusion which would ensue from any other rule, it is the opinion of the court that the Rebellion must be considered as in existence until the president declared it at an end in the proclamation of August 20, 1865." Judge Dillon adds an instructive review on the statutes, proclamations, and judgments in full justification of his ruling In a note to Brown v. Hiatt [Case No. 2,011], it is said that Judges Dillon and Caldwell decided that the Rebellion in Arkansas did not end until the proclamation of the president so declaring.

These unquestioned doctrines have not been extemporized for the modern and exceptional exigencies of the late Rebellion. They belong to the jurisprudence of all countries, and were adopted as part of that of our own from its earliest history. Our most conservative judges—Marshall, Story, and Taney—have been foremost in announcing them. No citizen would challenge the justness and the necessity of this rule. Judges have their peculiar duties, which, if faithfully and learnedly studied, have little tendency to make them familiar with current and rapidly changing conditions, upon which depend the important political questions of whether it is safe to relax on the instant military rule and restore intercourse and trade. In possible exigencies it may be true, as the learned judge said, that we know when peace is restored "without being told by the president." But all will concede that the safe depositary for this power is with a president and cabinet, and the congress, all of whom being specifically charged with the duty, constantly engage in ascertaining the facts upon which the policy of political action depends, and in full official communication with all the best sources of information, must necessarily be better informed in reference to situations, and better qualified to determine when peaceful relations should be reinstated with public enemies than a single judge. The mistake of his honor consisted in supposing that the cessation of hostilities was synonymous with the surrender of organized armies; that peace

meant the disbanding of military forces, instead of a full return of the masses of the people to loyalty and good citizenship. If armies disband only to disseminate their violence in private force or individual wrongs, governmental military rule may be necessarily continued, or restored after its discontinuance. The history of the country has shown that, in political opinion, this has been often necessary, and, whatever the judiciary may think, as citizens, of the policy of its exercise, the fact of its existence and duration must even be accepted by it as inexorably as it accepts any other political condition. The only resort for a tribunal, in any case, is that sad one, of which we have had too much experience, when violence renders impossible the longer recognition of the sovereignty which created it.

For the purpose of this reversal it is necessary to look further into the record. There is one other portion of the charge, however, which we desire briefly to notice. It appeared that the cotton had been sold to the Confederate government upon the understanding that it should sell and divide the proceeds. In order to produce a forfeiture it must appear that the owners of the property were not compelled, by force or bodily fear, to make the sale. In reference to this subject, the district judge said: "If this property was the property of the Confederate States authorities by any law, or was received by the agents of these Confederate States authorities acting under any military order requiring the citizens to furnish it as a tax or exaction, that should not be considered a voluntary act on the part of the original owners of the property, and would not subject it to seizure. The war was a civil war, as declared by the United States government, and the Confederates were accorded their rights, and treated as belligerents, and therefore they had the right to make rules and laws for the government of all within their lines. They had the right to levy taxes and perform other functions. The military commanders had the same rights as other military commanders under the government with which they were at war. They had the right to make exactions to carry on the war. They had the right to raise taxes, and to have the citizens comply, and give up their property on such terms as levied or ordered by the government." It is not for the purpose of saying that the accident of a pretended government, and laws, and officials, may not in any circumstances affect the question of the citizens' intent. There may be such wholesome fear of force and injury as to induce acquiescence in unlawful demands, without its actual infliction. This is fully conceded. These facts may not be without their force upon retrial to show the absence of a voluntary sale by the owners of this cotton. But that the mere existence of a law prescribed by an insurrectionary government is sufficient to bind the conscience or justify the ac-

tion of those who owe allegiance to a lawful sovereignty is a doctrine finding no warrant in the history of any government in the world. U. S. v. Keehler, 9 Wall. [76 U. S.] 83. The defendant was postmaster before the war, and gave bond as such. In virtue of a Confederate statute he paid over to a mail contractor, whom the federal government owed for services, the money in his hands. It was held this pretended law was no justification for such payment. At page 86, Justice Miller, for the court, says: "It certainly cannot be admitted for a moment that a statute of the Confederate States, or the order of its postmaster-general, could have any effect in making the payment to Clemmens valid. The whole Confederate power must be regarded as a usurpation of unlawful authority, incapable of passing any valid laws, and certainly incapable of divesting, by an act of its congress, or an order of one of its departments, any right or property of the United States. Whatever weight may be given under some circumstances to its acts of force on the ground of irresistible power, or whatever effect may be allowed in proper cases to the legislatures of the states while in insurrection, we propose to decide only when they arise. The acts of the Confederate congress can have no force as law in divesting or transferring rights, or as authority for any act opposed to the just authority of the federal government." The act now before the court was a sale in order to aid the overthrow and promote the destruction of that government. It being further urged in Keehler's Case that the Confederate government had ample military forces at the place where the defendant resided to compel obedience to its laws, and it did so enforce it like other governments, this position is answered as follows at page 87: "It will be observed that this statement falls far short of showing the application of any physical force to compel the defendant to pay the money to Clemmens. Nor is it in the least inconsistent with the fact that he might have been desirous and willing to make the payment. It shows no effort or endeavor to secure the funds in his hands to the government to which he owed both the money and his allegiance. Nor does it prove that he would have suffered any inconvenience, or been punished by the Confederate authorities, if he had refused to pay the draft of the insurrectionary post-office department upon him. We cannot see that it makes out any such loss of money by inevitable overpowering force, as could even on the mere principle of bailment discharge a bailer. We cannot concede that a man who, as a citizen, owes allegiance to the United States, and as an officer of its government holds its money or property, is at liberty to turn over the latter to an insurrectionary government, which only demands it by ordinances and drafts drawn on the bailer, but which exercises no force or threat of personal violence to himself or property in the enforce-

ment of its illegal orders." Hickman v. Jones, 9 Wall. [76 U. S.] 197. During the Rebellion the plaintiff in this action was arrested and tried for treason against the Confederate government. He now brought suit against the members of the court and all the officers in any way connected with the arrest and trial. The supreme court held that every act of the defendants was to be treated as if they were ordinary trespassers—that the Confederate constitution, government, and laws afforded no warrant whatever for their action. On page 200 Justice Swayne, for the court, said, "The rebellion out of which the war grew was without any legal sanction. In the eye of the law, it had the same properties as if it had been the insurrection of a county or smaller municipal territory against the state to which it belonged. The proportions and duration of the struggle did not affect its character, nor was there a rebel government de facto in such a sense as to give any legal efficacy to its acts. It was not recognized by the national nor by any foreign government. It was not at any time in possession of the capital of the nation. It did not for a moment displace the rightful government. The government was always in existence, always in the regular discharge of its functions, and constantly exercising all its military power to put down the resistance to its authority in the insurrectionary states. The union of the states for all the purposes of the constitution is as perfect and indissoluble as the union of the integral parts of the states themselves, and nothing but revolutionary violence can in either case destroy the ties which hold the parts together. For the sake of humanity, certain belligerent rights were conceded to the insurgents in arms. But the recognition did not extend to the pretended government of the Confederacy. The intercourse was confined to its military authorities. In no instance was there intercourse otherwise than of this character. The Rebellion was simply an armed resistance to the rightful authority of the sovereign. Such was its character in its rise, progress, and downfall. The act of the Confederate congress creating the tribunal in question was void. It was as if it were not. The court was a nullity, and could exercise no rightful jurisdiction. The forms of law with which it clothed its proceedings gave no protection to those who, assuming to be its officers, were the instruments by which it acted." It is unnecessary to quote from the numerous other judgments in the supreme and circuit courts, expressly and impliedly sustaining this undoubted position. This subject has been referred to only because an elaborate charge, so wholly disregarding them, had been delivered to a jury in an important and exciting case; it was thought a duty to reproduce a few of the many concurring judgments which so fully demonstrated the error of the learned district judge. The case of

Smith v. Brazelton. decided by the supreme court of Tennessee [1 Heisk. 44], is supposed by counsel to assert a contrary doctrine. We do not stop to reconsider that case. It was before us in Riddle v. Pillow [unreported]. We then said the question was one depending upon the constitution and laws of the United States, and in reference to which the rulings in the federal courts were mandatory; and, although we very confidently disapproved what we deemed its manifest errors in according to the Confederate government equally belligerent rights, we took pains to say no judgment was passed upon the peculiar facts in contest in that case; we said "hostilities existed and armies were on the march; the general commanding took what he did to warm and shelter his soldiers;" and, without deciding whether physical necessity, and to prevent suffering and want would constitute. in any possible case, a justification for the forcible appropriation of property. we denied then. as we do now, that it would derive the slightest additional support from the immaterial accident that the claim to do so was predicated upon any pretended authority derived from a rebel government. In reference to a question about which there is not a conflict in tribunals whose judgment we have any right to regard, it is unnecessary to follow the frequent repetitions which have applied it in so many different exigencies. All, without exception, say the Confederate government could make no law. Its prescriptions imposed no obligations, political or moral, and the only justification for obedience which the citizen could make to his rightful sovereign was deadly coercion by violence or threats. No such proof appears upon this record. The charge which informed a jury that a mere law, without more, was an excuse for obeying it, was erroneous.